# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **AMERIMEX RECYCLING, LLC, PAUL GONZALEZ, JOSEPH CADENA, AND SIMON JACKSON** | : | **DOCKET NO. 07-CV-2090** |
| **VS.** | : | **JUDGE MINALDI** |
| **PPG INDUSTRIES, INC.** | : | **MAGISTRATE JUDGE KAY** |

## ORDER

On July 7, 2009, defendants filed a motion for summary judgment.  Doc. 29.  For the reasons set forth below, defendant's motion is GRANTED in part and DENIED in part.

## Facts

This motion arises from a complaint filed in the 14th Judicial District Court, Parish of Calcasieu, State of Louisiana, on October 29, 2007.  Doc. 1, att. 1.  The original complaint alleged that defendant PPG, through the acts of its employees, falsely imprisoned Amerimex employees Paul Gonzalez, Joseph Cadena, and Simon Jackson; defamed Amerimex; and breached its contract with Amerimex.  Doc. 1, att. 1, pp. 2-3.  December 3, 2007, PPG sought removal to this court, pursuant to 28 U.S.C. §§ 1441 and 1446.  Doc. 1.  December 12, 2007, PPG filed a counterclaim against Amerimex, seeking a refund for scraps of metal taken and indemnity against Amerimex's claims, "pursuant to the terms of the contract between Amerimex and PPG."  Doc. 8, p. 7.

PPG and Amerimex have had a business relationship since 1995.[1]  Doc. 49, att. 1, p. 2.

---

[1]. Amerimex's owner, Juan Cadena, began working at PPG as a scrap dealer supervisor in 1995.  Doc. 49, att. 1, p. 2.  Mr. Cadena incorporated Amerimex Recycling, LLC in 2002, and immediately began working with PPG.  *Id.*

PPG operates a metal scrap yard which produces surplus metal.  *Id.*  Amerimex purchases discarded metals at a reduced rate.  *Id.*

On September 1, 2005, the parties entered into a written three-year contract for the purchase of scrap metal.  *See* doc. 1, att. 1, pp. 9-14.  Specifically, Amerimex was to purchase from PPG "No. 2 Heavy Melt Scrap Steel and Scrap Crushed Drums" at market price.  *Id.* at p. 9.  "Standard procedures" were to cover "light weight escorting" and Amerimex was to clean the scrap yard "to ground" most of the year.  *Id.* at p. 10.  The Contract also included a "General Conditions" section, which contained a clause indemnifying PPG from "any and all judgments."  *Id.* at p. 12.  In anticipation of the contract, Amerimex alleges an investment of $70,000.00 for an excavator, $30,000.00 for a magnet, $27,000.00 for a flatbed trailer, $10,000.00 for an eighteen-wheeler, and several thousands more for general maintenance in fulfillment of their contract with PPG.  Doc. 52, att. 1, p. 8.

PPG's yard produces many different types of scrap metal.  Doc. 49, p. 2.  Some metals, referred to in the industry as "exotic metals," are more valuable than others.  *Id.*  PPG separates the exotic metals from the non-exotic metals and places the metals in separate piles in their yard.  *Id.* at 3; *see also* doc. 53, att. 2, p. 2.  Buyers use large "jaws" to pick up the scrap metal from their pile and place it into their truck.  Doc. 49, att. 1, p. 4.  The rest of a buyer's pile is picked up using a large magnet or by hand.  *Id.*  On occasion PPG fails to totally separate the exotic metals from the non-exotic metals and exotic metals end up in the No. 2 Heavy Melt Scrap Steel Pile.  *Id.* at p. 3.  When Amerimex noticed this, they often took large chunks of exotic metals out of the No. 2 Heavy Melt Scrap Steel pile and set them aside for PPG before loading the entire pile.  *Id.*  Smaller pieces of exotic metal left in the No. 2 Heavy Melt Scrap Steel pile were sometimes inadvertently and other times purposefully loaded onto Amerimex trucks.  *Id.*  Nowhere in the

contract is "exotic metal" discussed or mentioned.  *See* doc. 1, att. 1, pp. 9-14.

On the morning of October 31, 2005, three Amerimex employees were working in the PPG scrap yard.  Doc. 1, att. 1, p. 3; doc. 29, att. 3, p. 6.  According to PPG, PPG employees at that time witnessed the Amerimex employees placing exotic metal in an Amerimex trailer.  Doc. 29, att. 3, p. 6.  The PPG employees notified their supervisor, Greg Trahan, who instructed PPG's security advisor to detain and search the Amerimex employees.  *Id.*  The security advisor contacted the Calcasieu Parish Sheriff's office, who questioned the Amerimex employees.  *Id.* at pp. 6-7.  Mr. Trahan gave the Sheriff an oral and written statement.  Doc. 15, att. 2, p. 8.

Searches reveled that metals other than No. 2 Heavy Melt Scrap Steel were in Amerimex's possession, including some exotic metal.  Doc. 52, att. 1, p. 8.  Amerimex did not deny that these metals were in its possession.  *Id.*  Rather, Amerimex argued that

> [t]hese metals, if PPG chose not to segregate them or remove them from the junk pile, have been taken by the contractors since [1995].  The junk pile has always had these materials in it and they have always been taken with the junk pile by the No. 2 Heavy Melt Steel buyer.  The extent of exotics in the pile varies depending on how hard PPG's employees worked to remove them from the pile.

*Id.* at 8-9.  After the incident, PPG terminated its contract with Amerimex.  Doc. 1, att. 1, p. 3.

## Law and Analysis

### A.    Legal Standard

Summary judgment should be granted when the movant demonstrates that no issue of material fact exists and that the movant is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56.  It is the movant's initial burden to inform the court of the basis for its motion and to identify those portions of the pleadings, depositions, and answers to interrogatories, admissions on file and affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is material if it "might affect the outcome of the suit under governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).

Once a proper motion has been made, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Celotex*, 477 U.S. at 325).  When a case is presented for judgment as a matter of law, courts must view the facts and draw reasonable inferences "'in the light most favorable to the party opposing the [summary judgment] motion.'"  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)).  A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson*, 477 U.S. at 248.

### B.    False Imprisonment

Under Louisiana law, the tort of false imprisonment occurs when one arrests and restrains another against his will and without statutory authority.  *Kyle v. City of New Orleans*, 353 So.2d 969 (La. 1977).   "The tort of false imprisonment consists of the following two essential elements: (1) detention of the person; and (2) the unlawfulness of the detention."  *Kennedy v. Sheriff of East Baton Rouge*, 935 So.2d 669, 690 (La. 2006) (citing *Tabora v. City of Kenner*, 650 So.2d 319, 322 (La. App. 1995).

PPG argues that Amerimex cannot produce evidence that its employees were detained against their will, "an obvious sine que non for false imprisonment."  Doc. 29, att. 3, p. 10.  PPG asserts that, here, the "against his will" element was not met because Amerimex employees were simply asked to remain and submit to an inspection of their vehicles, and they did so voluntarily. Doc. 29, att. 3, p. 10.  This was further evidenced, according to PPG, by the "sign prominently advising that entry of the premises constituted consent to investigation and search."  *Id.*  PPG has thus met its burden to demonstrate the absence of a genuine issue of material fact as to the false

-4-

imprisonment issue.  One cannot be imprisoned if he voluntarily submits to an inspection.

Amerimex counters that their employees were indeed detained against their will from 10:00 a.m., when they were initially apprehended by the PPG's security, until 4:45 p.m., when PPG finally let them go.  Doc. 49, att. 1, p. 15.  Amerimex, however, offers nothing to refute PPG's evidence.  Rather, Amerimex argues that PPG's detention was improper.  Doc. 49, att. 1, p. 15.  Be that as it may, Amerimex has adduced no evidence to illustrate that the detention was involuntary.  In fact, according to the affidavits that Amerimex offers, the "detention" included sitting on the tailgate of a truck and talking to with "courteous" security guards.  *See* Doc. 62, att. 1, p. 31.

Accordingly, the court finds that, as a matter of law, plaintiffs have no possibility of recovery against PPG on the claim of false imprisonment.

## C.    Defamation

In order to make a claim for defamation, a plaintiff must prove four elements: "(1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury."  *Kennedy*, 935 So.2d at 674.  Truth is an absolute defense to an action for defamation.  *Pool v. Gaudin*, 24 So.2d 383 (La. 1945).

The analysis for determining whether a privilege exists involves a two-step process.  *Kennedy*, 935 So.2d at 682 (citing *Smith v. Our Lady of the Lake Hospital, Inc.,* 639 So.2d 730, 745 (La. 1994)).  First, "it must be determined whether the attending circumstances of a communication occasion a qualified privilege."  *Id.*  Next, it must be determined "whether the privilege was abused, which requires that the grounds for abuse – malice or lack of good faith – be examined."  *Id*

Here, Amerimex alleged in its complaint that "employees of PPG during the course and scope of their employment for PPG told people that Amerimex employees were caught stealing at PPG." Doc. 1, att. 1, p. 3. PPG counters in support of their motion that "plaintiffs in this case have no evidence anything any PPG employee said about the incident in question was false. In fact, the plaintiffs acknowledge . . . that they were taking materials not described in the relevant contract." Doc. 29, att. 3, p. 11. Rather, PPG argues that, at each step of the incident, PPG employees, without malice, made truthful statements that were that were not published to an unprivileged third party. *Id.* at pp. 11-12.

Indeed, "Amerimex does not deny that it had metals other than No. 2 Heavy Melt Steel in its trucks." Doc. 49, att. 1, p. 7. What Amerimex denies, and uses to refute PPG's assertions of fact, is the unlawfulness of its having these metals (i.e. that Amerimex employees were "stealing"). *Id.* Amerimex, however, does not offer any specific facts to counter PPG's assertion that PPG's statements were privileged or true, as required by the summary judgment standard. Amerimex does not even allege exactly what statements were made by PPG that it is asking this court to hold are defamatory. In fact, the only instance where Amerimex hints to the defamation claim is in the initial complaint. Doc. 1, att. 1, p. 3.

In *Kennedy*, the Louisiana Supreme Court found that a privilege protected an employee detaining a suspect where the employee was reporting to the police the possible commission of a crime, as long as the party reporting the conduct did not do so with intent to mislead. 935 So.2d at 683. "In other words, the qualified or conditional privilege extended to the communication of alleged wrongful acts to the officials authorized to protect the public from such acts is founded on a strong public policy consideration: vital to our system of justice is that there be the ability to communicate to police officers the alleged wrongful acts of others without fear of civil action for

honest mistakes." *Id.*

Here, Amerimex has offered no evidence to show that PPG's report to the police was made with the intent to mislead.  Indeed, if PPG did not believe that what Amerimex was doing was "stealing," the issue would not be in front of the court.  Further, as established in *Kennedy*, PPG's allegations were privileged, as they were made to law enforcement.  935 So.2d 669. Likewise, internal discussions among PPG employees do not constitute a publication to a third party, if they are limited in scope to a business purpose.  *Carter v. Catfish Cabin*, 316 So.2d 517, 522-23 (La. App. 1975).

Amerimex has not met its burden under the summary judgment standard, and therefore cannot sustain a defamation claim against PPG.

### D.      Contract Termination

Amerimex asserts that PPG wrongfully terminated its contract with Amerimex, causing damage to Amerimex.  In support of their motion for summary judgment, PPG counters that "PPG had the contractual right, pursuant to paragraph 14 of the conditions on the reverse of the Purchase Order, to terminate the contract without cause, but had obviously sufficient cause to terminate it in any case."  Doc. 29, att. 3, p. 14-15.

First, PPG points to the back of the invoice that was issued to Amerimex, which states,

CANCELLATION.  Buyer reserves the right to cancel this Purchase Order, or any part thereof, at any time, without cause, by written notice to Seller.  In such event, Buyer shall pay for all materials or services delivered, completed, and accepted by Buyer and a reasonable settlement shall be reached, consistent with the price specified in this Purchase Order.  Upon receipt of notice of cancelation hereunder, Seller shall, unless otherwise directed, immediately discontinue all work in process and immediately cancel all orders or subcontracts given or made pursuant to this Purchase Order.

Doc. 29, att. 1, p. 12.  PPG argues that this clause allows PPG to unilaterally terminate their

contract with Amerimex without cause.[2]   Although PPG admits that a mutual "for cause" termination provision exists in the General Conditions contract [doc. 1, att. 1, p.12-14], PPG argues that the invoice/contract supersedes the General Conditions contract because the General Conditions contract also expressly states that it "in no way limits Seller's rights."  *Id.* at p. 13. PPG argues that one of those rights not limited is the right to unilaterally terminate their contract, as announced in the invoice/contract [doc. 29, att. 1, p. 12].  Doc. 29, att. 3, p. 15.

Next PPG argues that, even if cause for termination was required, Amerimex's "attempt to remove materials it obviously had no right to remove and which are much far more valuable than the items covered by its contract, is certainly sufficient cause for terminating that contractor's services."  *Id.*   According to PPG, there is no way that Amerimex will be able to show that they were allowed to remove exotic metal.

Amerimex counters that reasonable minds can differ to the interpretation of the contract. First, Amerimex points to the front of the invoice/contract containing the "cancellation" clause, which states, in its relevant part, "[t]his contract is issued to cover the sale of No. 2 Heavy Melt Scrap Steel and Scrap Crushed Drums by PPG to Amerimex Recycling L.L.C."  Doc. 29, att. 1, p. 6.  The "cancelation" clause on the back of the invoice, however, grants the "Buyer" a unilateral right to termination without cause.  *See* doc. 29, att. 1, p. 12.  According to the front of the invoice/contract, then, it is Amerimex that retains the right of unilateral termination, not PPG.

In support of their argument, Amerimex points to the "general rule of interpretation of contracts that written or typewritten words prevail over conflicting printed matter."  *Dean v. Pisciotta*, 57 So.2d 591, 593 (La. 1952).  The front of the invoice/contract was typewritten by PPG, while the "cancellation" clause on the back was printed.  *Cf.* doc. 29, att. 1, p. 6 *with id.* at

---

2. In support of this argument, PPG points to a 2007 decision, *Lee v. PPG Industries, Inc.*, No. 04-770, 2007 WL 1728669 (W.D. La. June 13, 2007), which, PPG argues, already decided the enforceability of this clause.  Doc. 29, att. 3, p. 15.

p. 12.

Second, Amerimex argues that PPG did not have cause to terminate the contract. Amerimex asserts that because the contracts themselves do not cover the issue of what is to take place when PPG, who "is responsible for maintaining the scrap yard and segregating the metals," leaves exotic metals in the junk pile, customary practices should fill in the gaps.  In support of this argument, Amerimex points to La. Civ. Code art. 2054 (2009), which provides,

> When the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose.

*Id.*

Amerimex then points to PPG's admission that "the general rule is that if exotic metal is in the junk pile Amerimex can take it," except when the exotic metal exceeded an unspecified size or weight.  Doc. 49, att. 1, p.10.  According to Amerimex, this "admits that Amerimex was entitled to something more than just the 'No. 2 Heavy Melt Scrap Steel and Scrap Crushed Drums' mentioned in the flawed contract."  *Id.* at 11.  At the least, Amerimex argues, a question of fact exists which renders PPG's motion for summary judgment improper.

As to this issue, the court agrees with Amerimex.  In the light most favorable to Amerimex, Amerimex has met the factual burden required to show that there is a genuine issue for trial.  Amerimex may proceed with a breach of contract claim against PPG.

### E.   Indemnification

PPG asserts that even if Amerimex could state a claim against PPG, PPG is indemnified by the express terms of the contract.  Specifically, PPG claims that "Amerimex's agreement to indemnify PPG against claims such as its own and the other plaintiffs, Amerimex employees, means that Amerimex's own claim, were it valid, is extinguished and it owes PPG

indemnification and defense against its employee's claims."[3]  Doc. 29, att. 3, p.16.

Amerimex counters that PPG cannot utilize an indemnification clause in a contract that PPG breached unless there exists in the contract a clear intent to do so.

In *LVI Environmental Services of New Orleans, Inc. v. Quest*, No. 06-649, 2007 WL 1235123, *5-6 (E.D. La. Apr. 26, 2007), the court laid out a comprehensive guide to indemnity clauses pursuant to Louisiana contract law:

> Louisiana Civil Code Article 2046 provides a general rule of contract construction: "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."  A contract's words are interpreted using the "general prevailing meaning," and when words may have one than more meaning, the meaning that best comports with the contract's purpose applies.  La. Civ. Code arts. 2047 & 2048.  Moreover, "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole."  La. Civ. Code. art. 2050.  If the meaning of a provision is in doubt or is not easily ascertainable, the court looks to the contract's nature, equity, usages and the parties' conduct before and after the contract's formation.  La. Civ. Code art. 2053.
>
> These general rules of contract interpretation apply when interpreting indemnity contracts.  *Sovereign Ins. Co. v. Texas Pipe Line Co.*, 488 So.2d 982, 984 (La. 1986) (citation omitted).  Further,
>
>> [a] contract of indemnity whereby the indemnitee is indemnified against the consequences of his own negligence is strictly construed, and such a contract will not be construed to indemnify an indemnitee against losses resulting to him through his own negligent act, unless such an intention was expressed in unequivocal terms.
>
> *Polozola v. Garlock, Inc.*, 343 So.2d 1000, 1003 (La. 1977) (citations omitted) (finding phrase "whether caused by [party's] negligence or otherwise, arising from any source" expressed intention to indemnify).
>
> When a contract of indemnity makes no express provisions for indemnification against the consequences of the indemnitee's negligence, and an unequivocal intention to so indemnify cannot be found after interpreting each contractual

---

3. In support of their argument, PPG cites only to *Houston Exploration Company v. Halliburton Energy Services, Inc.*, 359 F.3d 777 (5th Cir. 2004).  Although *Houston Exploration* did involve an indemnity clause, the issue in that case was not the application of the clause, but whether or not an agent of the indemnifying company had the proper authority to enter into such an agreement.  The court is at a loss as to the significance of this case.

provision in light of the whole contract and the general rules of contract interpretation, the court will presume that the parties did not intend to hold the indemnitee harmless from such liability. *Sovereign Ins. Co.*, 488 So.2d at 983.

*Id.*

According to Amerimex, the contract is silent as to indemnification when the contract is breached. The clauses at issue state,

> INDEMNITY: Buyer agrees to indemnify and save Seller, its subsidiaries and affiliates, harmless from any and all judgments, orders, decrees, awards, costs, expenses, including attorneys' fees and claims on account of damage to property (including claims under [local and national environmental laws]) or personal injury (including death) which may be sustained by the Buyer, the Buyer's employees, or the Seller, or the Seller's employees, or third persons, and arising out of or in connection with this sale, or the use or handling of the equipment or material sold whether such loss, damage, injury or liability is contributed to by the negligence of Seller or its subsidies or affiliates or their employees (except that this indemnity shall not apply to damages, injuries or the cost incident thereto to the extent caused by the sole negligence of the Seller).

Doc. 1, att. 1, p. 12.

> INDEMNIFICATION. Seller agrees to indemnify, defend and hold Harmless Buyer, its officers, employees and representatives, from and against any and all damages, claims, demands, expenses (including reasonable attorneys' fees), losses or liabilities of any nature whatsoever, and whether injury or damage to any person (including employees of seller) or property, and any and all suits, causes of actions and proceedings therein arising or allegedly arising from or related to the subject matter of this Purchase Order, including those losses caused by the negligence of Buyer, but except where such injury or damage was caused by the sole negligence of the Buyer. This indemnity shall survive the termination or cancelation of this Purchase Order, or any part thereof.

Doc. 29, att. 1, p. 12.

As instructed by *Quest*, 2007 WL 1235123, at *5-6, this court first looks to the plain meaning of the contracts. The first clause clearly applies to all actions based "on account of damage to property . . . or personal injury." Doc. 1, att. 1, p. 12. Particularly, the clause applies to damage to property or personal injury "arising out of or in connection with" the sale or handling of No. 2 Heavy Melt Scrap and Scrap Crushed Drums. *Id.* Thus, the court, like

Amerimex, reads this clause as being silent as to the application of the indemnity clause to actions arising out of breach of contract.

The plain text of the second clause, however, is broader.  That clause applies to "any and all suits . . . arising from or related to the subject matter of this Purchase Order . . . ."  Doc. 29, att. 1, p. 12.  Importantly, the clause also contains a survival clause, making explicit that indemnification "shall survive the termination or cancelation of this Purchase Order, or any part thereof."  *Id.*  However, as Amerimex alluded to above, a plain text reading of the second clause also upsets PPG's reading, as the "Seller" is the party indemnifying the "Buyer," and, here, PPG is clearly the "Seller" – PPG is selling No. 2 Heavy Melt Scrap and Scrap Crushed Drums to Amerimex, the "Buyer."  *Id.*  A plain text reading of the clause would indemnify Amerimex, not PPG.

Since the court finds that the meaning of both of the indemnity clauses is not easily ascertainable, the court is next instructed to look "to the contract's nature, equity, usages and the parties' conduct before and after the contract's formation."  La. Civ. Code art. 2053.  In so doing, the court is required to construe the contract against the drafter.  *Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 630 So.2d 759, 764 (E.D. La. 2007) ("[I]f after applying the other general rules of construction an ambiguity remains, the ambiguous contractual provision is to be construed against the drafter . . . .").  Additionally, doubts of interpretation must be "resolved against the seller."  *Southern-Gulf Marine Co. No. 9, Inc. v. Camcraft, Inc.*, 410 So.2d 1181, 1184 (La. App. 1982) (citing *Haymon v. Holliday*, 405 So.2d 1304 (La. App. 1981)).  PPG drafted both of the indemnification clauses, which were found in contracts governing the sale of No. 2 Heavy Melt Scrap and Scrap Crushed Drums from PPG to Amerimex.

Thus, the court finds that Amerimex has met its minimum burden under the summary

judgment standard.  Read in a light most favorable to Amerimex, there is at least a genuine issue of material fact as to the application of the indemnification clauses.  "Louisiana law clearly favors this option over construing the policy against the drafter, which is a last resort." *Rainbow USA, Inc. v. Crum & Forster Specialty Ins. Co.*, No. 06-4578, 2010 WL 1930660, *12 (E.D. La. May 11, 2010).  Ultimately, the court is not persuaded that either interpretation is clearly and unambiguously supported by the language of the contract.

Amerimex has presented enough evidence to warrant a jury determination regarding the interpretation of these provisions.

## <u>Conclusion</u>

At this stage, the court concludes that Amerimex has offered enough evidence to send at least some of the issues to a jury.  It will be up to the jury to determine whether the contract was wrongfully terminated and the extent of the indemnification clauses.  For the reasons stated herein, it is ORDERED that defendants' motion for summary judgment [doc. 29] be GRANTED in part and DENIED in part.

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, on September 27, 2010.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE