UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION


AMERIMEX RECYCLING, LLC, ET                    DOCKET NO. 2:07-CV-2090
AL.

V.

PPG INDUSTRIES, INC.                           MAGISTRATE JUDGE KAY

<u>OPINION</u>

The plaintiff, Amerimex Recycling, LLC (Amerimex), brought this lawsuit against defendant, PPG Industries, Inc. (PPG), seeking monetary damages for an alleged wrongful termination of a contract under which Amerimex separated scrap and purchased "No. 2 Heavy certain scrap metal Scrap Steel and Scrap Crushed Drums." *See* doc.1, att.1.

This suit was originally filed on or about October 29, 2007, in Louisiana's Fourteenth Judicial District Court. *Id.* It was removed, by PPG, on December 3, 2007, on the basis of federal diversity jurisdiction. Doc. 1. The parties consented to proceed before a United States Magistrate Judge [docs. 22 & 24], and this court presided over a bench trial commencing on September 19, 2011.

Having carefully considered the evidence presented at trial and the arguments of the parties, the court hereby enters the following findings of fact and conclusions of law. To the extent that any finding of fact constitutes a conclusion of law, the court hereby adopts it as such, and to the extent that any conclusion of law constitutes a finding of fact, the court hereby adopts it as such.

-1-

### *Findings of Fact*

On or about August 19, 2005, Amerimex entered into a written contract with PPG.[1]  The contract was signed by former PPG employee Jerry Boyles and Amerimex owner Juan Cadena (hereafter "Cadena").  Jerry Boyles testified that PPG drafted the contract in whole, which consisted of a standard form PPG Purchase Order and a PPG standard form Surplus/Used Equipment Sale – General Conditions document.

The specific terms contained in the PPG Purchase Order gave the details of the agreement as follows: the agreement was for the sale of No. 2 heavy melt scrap steel and scrap crushed drums by PPG to Amerimex.  The price to be paid to PPG was 65% of the monthly published American Metals Market (AMM) price for No. 2 heavy melt scrap for the Houston, Texas area and at $20 per gross ton for scrap crushed drums.  Each specific amount owed was determined by weighing Amerimex vehicles before and after they obtain a load of metal from PPG.  The contract period was from August 22, 2005 through July 31, 2008.

Trial testimony indicated that there were many details, customs, and practices between the parties that were omitted from the written agreement.  For instance, the contract did not specify where or how Amerimex would go about getting the scrap metal.  Testimony indicated that PPG would prepare a scrap metal pile in its scrap yard for its scrap metal buyer.  Furthermore, while the pile was made primarily of No. 2 heavy melt scrap, PPG would also include other materials in the pile.  This was due to the nature of the pile; scrap metal was once a part of something else (e.g., a car or a building roof), therefore, it would sometimes still be attached (welded or otherwise) to other materials.  Thus, this "other material" would, at times, be essentially garbage, such as parts of old appliances like refrigerators and ovens.  However, sometimes this "other material" would be scrap metals with a higher value than No. 2 heavy melt

---

[1] The written contract is Joint Trial exhibit #1.

scrap, such as copper, aluminum, nickel and other high value metals.  Potential scrap metal buyers viewed this pile and bid on the contract to haul it out.

Amerimex's normal practice would be to separate the materials, including high value metals, into various piles of like kind, and remove a pile when a sufficient amount accumulated. Previous scrap buyers at PPG had performed the same service but in a different manner. Previous scrap buyers would simply load all of the material, unsorted, from the scrap pile and separate it later.  Amerimex's off-site facility did not allow them to operate in this manner. Consequently, during the duration of their work at PPG there would be piles of various kinds of metals around the scrap pile for significant periods of time until enough like metal accrued to warrant removal.  Amerimex dealt only with materials PPG placed in its scrap pile, and during the fourteen months Amerimex performed under the contract, PPG never objected to this process.

On September 29, 2006, the long time scrap yard supervisor at PPG, Andrew Guidry, retired and was replaced by Greg Trahan (hereafter "Trahan").  It was exceedingly clear to this court from testimony at trial that there existed considerable friction between Trahan and Cadena. Trahan admitted that during his first meeting with Cadena he called Cadena a "smart ass." Thereafter, Trahan testified that he felt "uncomfortable" dealing with Cadena, and he no longer communicated with Cadena directly.  Trahan also testified that after the confrontation, Trahan "didn't need Amerimex in the plant."

On October 31, 2006, Amerimex entered the PPG scrap yard and filled one of its vehicles with metal from the scrap pile, including high value metals.  Several PPG employees, including Trahan, watched Amerimex and noticed what Amerimex was loading into its vehicle.  Rather than approach the Amerimex employees and question them about their activities or indicate that

they may have been doing something inappropriate, these PPG employees notified the PPG security supervisor and advised him that plaintiff was attempting to steal high value metals. Security stopped Amerimex's vehicle at the PPG gate and contacted the Calcasieu Parish Sheriff's Office who responded to the scene.  The Amerimex employees were questioned and ultimately released, but the Amerimex load of metal was not allowed to leave the PPG scrap yard.  As a result of this incident, PPG terminated its contract with Amerimex.[2]

After terminating the contract with Amerimex, PPG awarded the contract to another scrap buyer, Southern Scrap.  Between, January of 2007 and July 31, 2008, Southern Scrap removed 8,168,360 pounds of metal from the PPG scrap yard, for which it paid PPG $549,679.65.  *See* Joint Trial exhibit #5.

### Substantive Claim

### I.    Jurisdiction

This case was filed in state court and subsequently removed by the defendant.  The plaintiff, Amerimex, is a citizen of Louisiana, the defendant, PPG, is a citizen of Pennsylvania. The amount in controversy exceeds $75,000.  This court therefore has jurisdiction pursuant to 28 U.S.C. §§ 1332 & 1441.

### II.    Breach of Contract

Amerimex sued PPG claiming PPG terminated the contract without legitimate cause.  In response, it is PPG's position that it had the right to terminate the contract, without cause, at any time, pursuant to Paragraph fourteen of its "Purchase Order General Conditions."  The paragraph to which PPG refers is a pre-printed provision found on the back page of the standard form portion of the contract and reads:  "CANCELLATION.  Buyer reserves the right to cancel this Purchase Order, or any part thereof, at any time, without cause, by written notice to Seller."

---

[2] PPG's termination letter is Joint Trial exhibit #3.

PPG contends that it had cause to terminate due to the October 31, 2006, incident.  PPG also argues that under the contract Amerimex owes PPG indemnity and litigation costs, and that any damages that Amerimex may have suffered are limited by the contract terms.  PPG also filed a counterclaim against Amerimex for materials that Amerimex allegedly took from the scrap pile before the termination of the contract, but for which Amerimex has never paid PPG.

As noted above, this case is before this court on the basis of diversity subject-matter jurisdiction and involves a contract drafted and executed in Louisiana.  Thus, there is no dispute that Louisiana law is controlling in this instance.  *See Amica Mut. Ins. Co. v. Moak*, 55 F.3d 1093, 1095 (5th Cir. 1995) ("[s]tate law rules of [contract] construction govern in diversity cases").

a.  *PPG's Claim that Contract is Terminable at Will*

PPG has asserted that its contract with Amerimex could be terminated without cause under paragraph fourteen of the Purchase Order.  We find otherwise.

Paragraph fourteen of the document upon which PPG relies allows the *buyer* the right to cancel the contract without cause.  Here, Amerimex is the buyer.  Nevertheless, PPG argues that because the contract was printed on a form which PPG usually uses to purchase materials, PPG is in fact the "buyer." In support of its position, PPG notes that Cadena signed on the "seller" line of the contract.

When a contract is reduced to writing and the words of that writing are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.  *See* La Civ. Code art. 2046.  If a provision in a contract is susceptible to different meanings, the provision must be interpreted with a meaning that renders it effective, and each

-5-

provision must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.  *See* La. Civ. Code arts. 2049, 2050.

PPG entered into a contract with Amerimex for a specific term, yet maintains it could cancel without cause due to a boilerplate, pre-printed provision on the reverse side of a standard contract form that it prepared.  It would be inconsistent with the intent of the parties for PPG to enter a contract for a specified period yet be allowed to terminate without cause.

Also paragraph seven of the "Surplus/Used Equipment Sale – General Conditions" document has its own cancellation provision which provides in part:

> Buyer's failure to satisfactorily comply with all the conditions of this Agreement shall entitle the Seller to cancel this Agreement without obligation by written notice to the Buyer.  This condition in no way limits the Seller's rights.  Inaction of the Seller shall not be construed as waiver or forgiveness of the Buyer's failures or defaults.

This paragraph clearly gives PPG, "the Seller," the right to cancel the contract with Amerimex, "the Buyer," for cause.  Should paragraph fourteen allow termination at will as PPG alleges then this paragraph is meaningless.

Paragraphs fourteen and seven thus render the contract ambiguous. "In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text.  A contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party."  La Civ. Code Art. 2056. The ambiguities created by these conflicting provisions must be resolved in favor of Amerimex as PPG is the creator of the document.  We therefore find the contract could not be terminated without cause.

b.  *PPG's Claim it had Cause to Terminate*

At trial PPG asserted two theories to support its claim that termination of the contract was with cause.  First, PPG argued that the incident from October 31, 2006, when Amerimex was

"stealing" high value metals from PPG's scrap yard, created cause for termination.  The language of the contract entitled Amerimex to remove only "No. 2 heavy melt scrap and crushed drums." It did not allow Amerimex to remove higher grade, more expensive metals.  However, the contract did not provide details of how or in what manner Amerimex would come into contact with the metals it was allowed to remove or what procedure it was to use to separate out anything that did not qualify as "No. 2 heavy melt scrap and crushed drums."

The uncontested evidence offered at trial was that PPG created a scrap pile in its yard that was *mostly* No. 2 heavy melt scrap to be disposed of by Amerimex.  It is also uncontested that routinely PPG would inspect the piles and remove from them items such as high quality metals inadvertently placed there.

When parties to a contract make no provision for a particular situation, "it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose."  La. Civ. Code. art. 2054.  "Usage, as intended [in article 2054], is a practice regularly observed in affairs of a nature identical or similar to the object of" the contract at issue.  *See* La. Civ. Code. art. 2055.

Amerimex was to remove all materials left in the scrap pile.  In fact, the contract requires that Amerimex "clean the scrap yard to bare ground."  On occasion Amerimex would notice items, more valuable than the No. 2 heavy melt scrap pile and would notify PPG.  PPG would then reclaim these items. PPG never contracted to have Amerimex sort through the scrap pile. Amerimex suggested that it did this only to further its relationship with PPG, and there was no contractual obligation to do so.  Further, the evidence adduced at trial clearly indicated that it was the customary practice of PPG's scrap metal buyers, before, after, and during Amerimex's

-7-

contract to take everything in the scrap metal pile.  PPG employees testified that scrap buyers before Amerimex would use large mechanical arms to indiscriminately grab portions of the scrap pile to load into their trucks for hauling out.  PPG knew of this practice and knew that pieces of high value metal would be taken along with the No. 2 heavy melt.

Moreover, Amerimex was also aware of this custom for scrap purchasers to indiscriminately haul the scrap from the pile. Cadena had worked at the PPG scrap yard for various scrap metal buyers since the mid-1990s.  As we noted earlier, plaintiff would sort at the PPG facility and then remove because size limits of Amerimex's facility did not allow it to haul off the piles and sort at its own facility.  Amerimex's deviation from the customary practice of other scrap metal buyers was to sort on location rather than remove the entire pile and sort later.  Nevertheless it is clear that the customary practice of PPG scrap metal buyers was to take all that was left by PPG in the pile.

There is no evidence that PPG ever objected to how Amerimex performed its contract and what it removed until the appearance of Mr. Trahan who, for whatever reason, apparently did not care for Cadena.  It is particularly disturbing that PPG employees watched Amerimex employees do what they (PPG personnel) apparently believed to be inappropriate and virtually set them up to be stopped and questioned by law enforcement.  Neither Trahan nor anyone else working with PPG gave Amerimex any advance warning that it was behaving inappropriately.  It is the opinion of this court that the entire episode was manufactured by Trahan to *create* cause to terminate the contract because of Mr. Trahan's personal dislike of Cardena.

For these reasons we conclude PPG did not have cause to terminate its contract with Amerimex due to the "incident" occurring on October 31, 2006.

PPG's second contention at trial with respect to cause of termination was that Amerimex performed poorly in its execution of the contract warranting PPG's cancellation.  Specifically PPG presented evidence at trial that Amerimex was slow in removing the scrap metal and never cleaned the scrap pile to bare ground.  As was made clear during the trial when PPG adduced evidence on this point, we consider this alternative theory to be an afterthought by PPG.

 Nothing in its pleadings or reports to the court filed before trial suggested that PPG ever considered poor performance to be the cause behind termination of the Amerimex contract. Furthermore, Mark Young, PPG's purchasing agent who ultimately decided to terminate the contract, testified at trial that the sole reason for termination was the October 31, 2006, incident. To rebut PPG's assertion of poor performance, Amerimex noted the difficulties posed by Hurricane Rita shortly after the start of the contract period as one defense, among others.

We also conclude that PPG failed to prove Amerimex's performance under the contract was just cause for termination. Therefore, neither Amerimex's sorting procedure nor Amerimex's allegedly poor performance in general was sufficient for PPG to terminate the contract prematurely.

Accordingly we conclude that PPG terminated the contract with Amerimex without just cause and find in favor of Amerimex on its claim for wrongful termination of the contract.

### III.    Damages

Under Louisiana law, "[d]amages are measured by the loss sustained by the obligee and the profit of which he has been deprived." La. Civ. Code art. 1995.  Generally, in cases of a sale of goods contract, a buyer's measure of damages for seller's breach is the difference between the contract price and the market value of the goods to be bought.  *See Southern Scrap Material Co. v. Commercial Scrap Materials Corp.*, 120 So.2d 491, 494 (La. 1960); *Lady Ester Lingerie*

*Corp. v. Goldstein*, 21 So.2d 398, 402 (La. App. 1945).  However, the evidence in this case shows that Amerimex did not usually obtain one hundred percent of the market value upon the resale of the scrap metal it obtained from PPG.  Therefore, the proper measure of damages would be the usual value that Amerimex would obtain for the metal upon resale, as opposed to full market value.

Due to the many variables, such as the various types of metals at issue, uncertain amounts, and fluctuating values, a precise measure of damages owed to Amerimex cannot be calculated with mathematical certainty.  In such a situation, Louisiana Civil Code article 1999 provides: "[w]hen damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages."  The most appropriate way for this court to approximate Amerimex's damages is to examine Amerimex's historical performance under its contract with PPG, and its subsequent resale of the scrap metal. The 2006 fiscal year is the best representation of Amerimex's historical performance because 2006 is the only full year during which Amerimex performed under its contract with PPG.

Using the 2006 tax return, Amerimex's cost of goods sold (COGS) for that year was $615,452, and its gross sales amounted to $1,213,712.[3]  Thus, the COGS-to-sales percentage is 50.7%.[4]  It is possible also to calculate the percentage of Amerimex's expenses during that year. Amerimex's total deductions were $464,984, including guaranteed payments to partners (profits distributed to the owners) and the depreciation of Amerimex's assets, but these non-cash expenses should not be included in calculating Amerimex's actual expenses because they are annual, recurring expenses. *See* Doc. 93-1, pp. 145-147 & Doc. 94, p. 19. Not including these non-cash figures, Amerimex's expenses for 2006 total $225,471.  Therefore, when the expense

---

[3] *See* Plaintiff's exhibit # 5.
[4] $615,452/$1,213,712 = 0.5070 \approx 0.507$

total is divided by Amerimex's gross sales for 2006, Amerimex's expenses for that year were just under 18.6% of its gross sales.[5]

It is possible to calculate Amerimex's loss of revenue for the unexpired portion Amerimex's contract with PPG (January of 2007 through July 31, 2008) by considering the amount of scrap removed by Amerimex's successor, Southern Scrap. During the relevant time period Southern Scrap hauled 8,168,360 pounds of scrap metal, for which it paid PPG $549,679.65.

Amerimex's projected damages can be estimated by using its historical percentages for expenses-to-sales (18.6%) and COGS-to-sales (50.7%), when used in conjunction with the figures from Southern Scrap's haul. Amerimex's total gross sales can be projected at $1,084,180.77.[6] Thus, Amerimex's gross lost profits can be projected at $534,501.12.[7] Now, using the expense percentage above (18.6%) with Amerimex's projected total gross sales ($1,084,180.77), Amerimex's projected total expenses are found to be $201,657.62.[8] When this figure is deducted from Amerimex's projected gross lost profits ($534,501.12), Amerimex's projected net lost profits calculate to $332,843.89.

PPG does not concede this to be an appropriate methodology insofar as it maintains that use of Southern Scrap's total haul of scrap metal from PPG during the remaining time under the contract in inappropriate. PPG contends that Amerimex would not have been able to haul as much as Southern Scrap because Amerimex did not have the same machinery and manpower. Additionally, PPG notes that Amerimex's historical performance under the contract does not

---

[5] $225,471/$1,213,712 = 0.185769 ≈ 0.186
[6] $549,679.65 divided by .507.
[7] The difference between $1,084,180.77 and the cost of goods, $549,679.65.
[8] (0.186) x $1,084,180.77 = $201,657.62.

indicate that it could have removed 8,168,360 pounds of scrap during the remaining twenty-one months.

PPG's contention is rejected for several reasons.  First, the trial evidence indicated that around the time the Amerimex-PPG contract was terminated, the size of the scrap pile at PPG grew substantially because of a recently resolved workers' strike at PPG and an increase in available scrap metal following the clean-up efforts after Hurricane Rita. Therefore, Amerimex's historical performance under the contract is not necessarily indicative of its potential capacity to haul out an increased volume of scrap metal.  Furthermore, trial evidence also indicated that Amerimex had ordered additional equipment to aid in its loading and hauling of the increased supply of scrap.[9]  Finally, if PPG did not terminate the contract, Amerimex would have had an additional two months, November and December 2006, to load and haul the scrap in comparison to Southern Scrap, as Southern Scrap did not begin work at PPG until January 2007.  For these reasons, this court finds it appropriate to use the figures from Southern Scrap's time at PPG to project Amerimex's lost profits.

Having concluded Amerimex's damages, the court now turns to PPG's arguments for limiting these damages.

Within the contract there are several provisions which speak to this issue, and PPG has suggested that these provisions limit any potential damages that this court may award.  The first is paragraph one of the Surplus/Used Equipment Materials Sale – General Conditions document. This paragraph states:

> LIABILITY LIMITATION: Buyer agrees that the equipment
> and/or material supplied hereunder is sold as a scrap, surplus or
> salvage product in "as is" condition and seller makes no express or
> implied warranties in connection therewith including without
> limitation warranties of merchantability or fitness for purpose, nor

---

[9] *See* Plaintiff's exhibits # 6 & 7.

> does seller represent that the equipment or material is suitable for use in any capacity. The limit of seller's liability for any claim arising out of this transaction whether in contract, tort, or strict liability shall be the invoice price of the particular shipment out of which the claim arises and in no event shall seller be liable for any special, indirect or consequential damages.

Joint Ex.1.

It is PPG's contention that this paragraph limits any potential damage award to the cost of the particular shipment out of which this dispute arose.  Therefore, PPG concludes that Amerimex's damages should be only the price of the materials which Amerimex tried to remove on October 31, 2006.

This assertion is without merit.  As described above, the dispute in this case did not arise out of a particular transaction as PPG suggests; rather it was PPG's premature termination of the contract which gave rise to this suit.  In other words, Amerimex's claim does not involve a particular load of scrap metal but a breach of the contract in whole.

Furthermore, the construction of this provision gives rise to the possibility of different interpretations.  Paragraph one is two sentences.  The first sentence clearly disclaims all warranties of the product that PPG is selling.  The second sentence limits the remedies available to Amerimex, but this limitation is specific to claims arising from a particular shipment and does not necessarily apply to claims arising out of a breach of the contract as a whole.   Thus, this paragraph can be interpreted narrowly, to apply only to claims arising out of a particular shipment, or broadly, as PPG suggests, encompassing any and all claims arising out of the contract.   In such a situation, where the provision is part of a standard form contract drafted solely by PPG, the provision must be interpreted narrowly in favor of Amerimex.  Therefore, this court concludes that paragraph one does not limit Amerimex's potential damages in this case.

Next, there are two indemnity provisions within the contract. The first is paragraph eleven of the standard form PPG Purchase Order. This paragraph states:

> INDEMNIFICATION. Seller agrees to indemnify, defend and hold harmless Buyer, it's [sic] officers, employees and representatives, from and against any and all damages, claims, demands, expenses (including reasonable attorneys' fees), losses or liabilities of any nature whatsoever, and whether involving injury or damage to any person (including employees of Seller) or property, and any and all suits, causes of action and proceedings thereon arising or allegedly arising from or related to the subject matter of this Purchase Order, including those losses caused by the negligence of Buyer, but except where such injury or damage was caused by the sole negligence of Buyer. This indemnity shall survive the termination or cancellation of this Purchase Order, or any part thereof.

Joint. Ex. 1. The second is paragraph three of the Surplus/Used Equipment Materials Sale – General Conditions document. This paragraph provides:

> Indemnity: Buyer agrees to indemnify and save Seller, its subsidiaries and affiliates, harmless from any and all judgments, orders, decrees, awards, costs, expenses, including attorneys' fees and claims on account of damage to property (including claims under the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act and similar federal, state or local laws) or personal injury (including death) which may be sustained by the Buyer, the Buyer's employees, or the Seller, or the Seller's employees, or third persons, and arising out of or in connection with this sale, or the use or handling of the equipment or material sold whether such loss, damage, injury or liability is contributed to by the negligence of the Seller or its subsidiaries or affiliates or their employees (except that this indemnity shall not apply to damages, injuries or the cost incident thereto to the extent caused by the sole negligence of the Seller).

Joint. Ex. 1.

PPG's position is that both paragraph eleven of the standard form PPG Purchase Order and paragraph three of the Surplus/Used Equipment Materials Sale – General Conditions document protect it from suit.

With respect to paragraph eleven of the standard form PPG Purchase Order, PPG again contends that because this portion of the contract was drafted on a form PPG usually uses to purchase items, it is the "Buyer" referenced in the provision. This court, again, rejects this contention. Amerimex is clearly the buyer under the contract. Nowhere in the agreement does it suggest that PPG is the "Buyer" referenced in the standard form PPG Purchase Order portion of the contract.  For this reason, this court must interpret this provision in favor of the non-drafting party to the standard form contract, and thus finds that paragraph eleven indemnifies Amerimex. In light of this finding, this court also finds that paragraph eleven of the standard form PPG Purchase Order indemnifies Amerimex against PPG's counter-claim in this matter.

However, paragraph three of the Surplus/Used Equipment Materials Sale – General Conditions document does indemnify PPG, "the Seller," but it does so only in limited situations. This provision provides for indemnity in suits for property damage and personal injury.  Since this is a breach of contract action, paragraph three of the Surplus/Used Equipment Materials Sale – General Conditions document is not applicable.  Therefore, this court finds that Amerimex's damages are not limited by the terms of the contract.

We do find that PPG is entitled to a reduction in the award to Amerimex in that Amerimex never paid PPG for the loads of metal it removed during October of 2006.  This amounted to $13,588.89 due PPG for scrap metal.  *See* Defendant's exhibits # 1 & 3. Accordingly this figure must be deducted from Amerimex's damage award for a total amount due to Amerimex of $319,255.00.

### *Conclusion*

For the foregoing reasons, this court finds that PPG breached its contract with Amerimex, and that Amerimex sustained damages as a result in the amount of $332,843.89.  This award is

reduced by the sum owed to PPG by Amerimex for unpaid scrap, $13,588.89, for a total award to Amerimex in the amount of $319,255.00 together with judicial interest and costs.

 The parties are hereby ordered to draft and file a judgment for review and signature by the undersigned in accordance with the findings above.  This judgment shall be filed within fourteen (14) days of the issuance of this ruling.

 THUS DONE AND SIGNED in Chambers this 17th day of May, 2013.


_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE